IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

AUSTI M. VERBY,

Plaintiff,

vs.

PAYPAL, INC., et al.,

Defendants.

8:13-CV-51

MEMORANDUM AND ORDER

The plaintiff, Austi Verby, has sued her former employer and several of its employees for allegedly discriminating against her in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.; retaliating against her for activity protected by Title VII; violating the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601 *et seq*.; and tortious interference with an employment relationship. The matter is before the Court on the defendants' motion for summary judgment (filing 45). The Court will grant the defendants' motion and dismiss the plaintiff's complaint.

## I. BACKGROUND

The plaintiff was hired by PayPal, Inc., one of the defendants, in August 2005. Filing 46 at 3;[1] filing 47-2 at 127. The other defendants worked

---

[1] The Court has relied, in large measure, on the statement of facts contained in the defendants' brief in support of their motion for summary judgment (filing 46). NECivR 56.1(a) requires a party moving for summary judgment to include in its brief a statement of facts consisting of short numbered paragraphs, with citations to the record. The defendants have followed the rule. Filing 46 at 3-18. NECivR 56.1(b)(1) further requires a party opposing summary judgment to

> include in its brief a concise response to the moving party's statement of material facts. Each material fact in the response must be set forth in a separate numbered paragraph, must include pinpoint references to affidavits, pleadings, discovery responses, deposition testimony (by page and line), or other materials upon which the opposing party relies, and, if applicable, must state the number of the paragraph in the movant's statement of material facts that is disputed. <u>Properly referenced material facts in the movant's statement are considered admitted unless controverted in the opposing party's response.</u>

with the plaintiff: Jody Willey was the plaintiff's supervisor, Heather Johnson was Willey's manager, and Justin Sebeck was the co-worker who allegedly harassed the plaintiff. Filing 46 at 3-4; filing 47-2 at 20-21.

The plaintiff became a PayPal fraud appeals agent in 2006. Filing 46 at 3; filing 47-2 at 76. A fraud appeals agent is commonly responsible for handling situations such as unauthorized access to a customer's PayPal account, or accounts created using stolen financial information. Filing 47-2 at 78. Such an account is restricted and PayPal requests additional documentation from the customer; once that information is provided, or if the customer calls customer service, the fraud appeals agent is responsible for reviewing the account and deciding whether to restore unrestricted use or keep the restrictions in place. Filing 47-2 at 80-81.

In August 2011, the plaintiff began taking occasional leave because her maternal grandmother was ill. Filing 46 at 7. The plaintiff continued to take intermittent leave to help her grandmother, a few hours at a time, over the remainder of her employment with PayPal. Filing 46 at 7, 17-18; filing 47-3 at 5-25. At no point did PayPal deny any of the plaintiff's requested leave. Filing 46 at 7, 17.

In October 2011, the plaintiff was issued a "Conversation Memo" informing her that her job performance was not acceptable.[2] Filing 46 at 7-8; filing 47-2 at 137. Specifically, the plaintiff was informed of her low quality control scores and told that her performance had been the lowest on her team

---

(Emphasis in original.) That rule is not hard to follow: just read the movant's statement of facts, and identify which ones are disputed. But the plaintiff's brief opposing summary judgment completely disregards the rule. *See,* filing 50 at 10-11; filing 51 at 1-5. The Court has nonetheless tried to give the plaintiff the benefit of any factual disputes that are apparent from her argument or were discovered in the Court's own review of the record. The plaintiff, however, has waived any objection of her own to the defendants' statement of facts by failing to properly dispute it. *See*, *Jackson v. United Parcel Serv.*, 643 F.3d 1081, 1088 (8th Cir. 2011); *Ballard v. Heineman*, 548 F.3d 1132, 1133-34 (8th Cir. 2008); *Libel v. Adventure Lands of Am., Inc.*, 482 F.3d 1028, 1032-33 (8th Cir. 2007); *Jones v. United Parcel Serv.*, 461 F.3d 982, 989-91 (8th Cir. 2006); *Nw. Bank & Trust Co. v. First Ill. Nat'l Bank*, 354 F.3d 721, 724-25 (8th Cir. 2003); *compare* *Jenkins v. Winter*, 540 F.3d 742, 747 (8th Cir. 2008).

[2] Other disciplinary incidents, both before and after, are reflected in the record, but the Court does not find it necessary to discuss them all. They were not all part of the stated basis for the plaintiff's termination, *see* filing 47-2 at 149-50, nor are they all similar to the incidents for which PayPal says the plaintiff was fired. And an employer is limited in the extent to which it can rely on *post hoc* justifications for an employment decision. *See, e.g.*, *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 995 (8th Cir. 2011); *see also* *McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 360 (1995). The Court has therefore focused its attention on the reasons PayPal gave for firing the plaintiff. *See* filing 47-2 at 149-50.

during that quarter. Filing 47-2 at 137. It was also noted that she had been given detailed guidance on several occasions but continued to make the same errors. Filing 47-2 at 137. And she was warned that failure to improve her performance could result in further discipline, up to and including termination. Filing 47-2 at 137.

Sebeck and the plaintiff worked together, although not constantly—their shifts overlapped on Fridays, and when the plaintiff came in to make up hours or work overtime. Filing 47-2 at 26-27. The plaintiff first complained about Sebeck to Willey in late December 2011 or January 2012. Filing 47-2 at 98. She said that Sebeck was watching everything she did at work and trying to get her in trouble by reporting her activities, so she felt like she was "constantly on the defense" because she had to keep track of her cases and explain later what she had been doing. Filing 47-2 at 95. The plaintiff said people had told her that he was watching her breaks and telling her supervisors what she was doing. Filing 47-2 at 97. Sebeck also reportedly used instant messaging to report her work activities to others, forcing her to explain herself when he got her in trouble. Filing 52-18 at 3-5. The plaintiff's affidavit summarizes her accusations:

> [Sebeck] repeatedly gave me visual or physic [sic] nonconsensual communication, verbal, written or implied threats or a combination causing a reasonable amount of making me uncomfortable in the work place. Justin Sebeck would watch every break I took, who came to my desk to talk to me. He was quick to keep a log of when I would walk away from my desk to help someone, go to break, or use the restroom and then report it to a supervisor in the department. [Sebeck] would randomly walk behind me while I was at my desk and stare at my computer as he walked by.

Filing 52-11 at 5. In other words, according to the plaintiff, Sebeck was a tattletale. But, the plaintiff admits, she never actually spoke to Sebeck about anything. Filing 47-2 at 26.

In response, Willey contacted Johnson and Sebeck's supervisor. Filing 47-2 at 98. The plaintiff's desk was moved away from Sebeck's. Filing 47-2 at 104-05. According to Willey, such a move may be undertaken regardless of the underlying complaint's validity, to make sure that employees know they are listened to and their concerns are taken seriously. Filing 52-20 at 5. But when switching desks didn't help, after extended discussions with Willey, the plaintiff contacted PayPal's human resources consultant, MyHR, on April 20,

2012, and alleged that Sebeck was harassing her. Filing 46 at 9; filing 47-2 at 106, 152.

Specifically, on the complaint form, the plaintiff said she

> would like someone to contact me regarding filing a report on a [sic] employee by the name of Justin Sebeck in regards to actions that have lead [sic] up to an unconfortable [sic] work environment. I have reported these actions to my Supervisor Jody Willey and she has directed me to you.

Filing 47-2 at 152. According to the case notes, the plaintiff described Sebeck's behavior to the MyHR investigator as Sebeck reporting things to a senior agent with whom Sebeck was friends outside of work, "making exaggerated reports, of me being late," and making comments such as "hostile work environment." Filing 47-2 at 152.

In a follow-up email to the MyHR investigator, the plaintiff explained her allegations in more detail. Filing 46 at 10; filing 47-2 at 152-54. The plaintiff reported that:

> I first noticed the issues with Justin Sebeck towards the end of August beginning of September 2011. This was the [sic] around the time I noticed that he would watch when I took my breaks, who was coming to my desk or if I would assist someone at their desk.
>
> . . . .
>
> During [the end of October-early November 2011] is when it was brought to my supervisors [sic] attention (Jody Willey) that I was having multiple people come to my desk for 45 plus minutes at a time.
>
> Between this occurrence and the next one I noticed that [Sebeck] was paying close attention to every time I left me [sic] desk, etc. As I explained to you he makes it very obvious by looking directly at you, getting up and walking in the vicinity of where I am, or staring me down as he walks past. It was also brought to my attention by other agents that he was watching me. This behavior continued through the months of November, December, January, February and March.

> Then next time I was approached by a supervisor . . . who told myself and another agent to stop talking. I was having a completely work related conversation with this agent assisting them regarding appeals process. While I was assisting this agent I could see [Sebeck] staring at myself and this other agent. He waited until I was done helping this agent and walked over to [the supervisor's] area spoke to [the supervisor] and a few of the agents in her area. Once [Sebeck] sat down [the supervisor] came over to speak with me. I reported this to Jody Willey first thing in the morning. ([Willey] advised me that she had no report of this from [the supervisor.])
>
> After this occurrence and speaking with [Willey] in depth about [Sebeck]'s behavior and finding out that he was doing this to other agents (who wish not to come forward), [Willey] advised me that this situation was considered to be a hostile work environment and that it was time for us to escalate the situations. [Willey] contacted [Sebeck's supervisor] and Heather Johnson regarding the next steps to take. [Willey] later advised me that [Sebeck's supervisor] spoke with [Sebeck] regarding this behavior and she provided a [sic] email follow up to both [Willey] and [Johnson].
>
> Once the conversation took place [Sebeck]'s behavior did change temporarily. [But after Sebeck's supervisor changed,] [Sebeck] started to go back to the same activity. On March 23rd I was sitting in my desk which at the time was located one row over from [Sebeck]. He was standing up and talking to one of his teammates when he said very loud and obnoxiously: "You better watch out or it may be considered a hostile work environment". Immediately the agent he was speaking to responded with: "Did you talk to [your supervisor] about that?" At the time [Sebeck's supervisor] immediately stepped in and said yes and to stop it. At this time I emailed [Willey] advising her that I needed to talk to her, which was the email I forward to you yesterday. Once [Willey] and I discussed this last situation she advised me that she would contact [Sebeck's supervisor] on what they felt was the best action to take going forward. At this time I was advised that my next course of action would be to contact HR.

Filing 47-2 at 153-54. The plaintiff explained that Sebeck "is a busy body and in everyone's business" and that "any action taken may only be a temporary resolution before the behavior starts again." Filing 47-2 at 155.

The MyHR investigator interviewed the plaintiff, Willey, Sebeck, and Sebeck's supervisor. Filing 46 at 10; filing 47-3 at 1-2. Willey reported that there was a "history" between the plaintiff and Sebeck; that they "did not like each other" and "were friends in and outside of work with people who did not like each other." Filing 47-3 at 1. Sebeck indicated that he had not mistreated the plaintiff, but "felt that she was not good at her job." Filing 47-3 at 1. According to the MyHR investigator, the plaintiff reported that

> she and [Sebeck] overlapped one day a week (Friday) at work and that she felt he was trying to get her in trouble; watching her, timing her breaks etc. [The plaintiff] [i]ndicated that she and [Sebeck] have never spoken. [The plaintiff] was concerned about a supervisor/lead . . . who was a "friend" of [Sebeck's] and that made [the plaintiff] uncomfortable because she felt [Sebeck] could get her in trouble by making complaints to [his friend].

Filing 46 at 10; filing 47-3 at 2. The investigator resolved the plaintiff's complaint as follows:

> After speaking with [the plaintiff], [Sebeck] and their respective supervisors' [sic] multiple times I was unable to substantiate any rule, policy or procedure being violated. It was explained to [Sebeck] that there was a perception of him from [the plaintiff] that he needed to change. He agreed to keep his distance from her but denied any intentional hostility. There was a sideline issue that took place during this investigation; it was reported by their respective supervisors that both [the plaintiff] and [Sebeck] continued to talk to their friends/co-workers about this issue and that there was an "investigation." They were each cautioned to keep matters confidential but the complaints continued to come forward. I considered anyone who would be considered a witness tainted and because there was not a specific allegation of a particular incident the case was closed. This was communicated to [the plaintiff] with the urging that if there were any further issues with [Sebeck] or anyone else she should bring them forward immediately. She seemed satisfied with this outcome when communicated to her on 5/25/2012. [Willey] and [Sebeck's

supervisor] agreed to closely monitor the situation going forward in addition.

Filing 46 at 10-11; filing 47-3 at 2. After the investigation was closed on June 5, 2012, the plaintiff had no further problems with Sebeck. Filing 46 at 11-12.

Meanwhile, the plaintiff had continued to receive warnings about her job performance. Filing 46 at 12. On June 24, 2012, she was issued a "Corrective Counseling" memo on quality and decisionmaking. Filing 46 at 12-13; filing 47-2 at 143. This time, she was told that "immediate improvement" was required, "specifically in the area of Quality." Filing 46 at 13; filing 47-2 at 143. The memo highlighted two instances in which customer appeals had been denied when, in fact, the hold on each account should have been lifted. Filing 46 at 12; filing 47-2 at 143. The memo also re-emphasized the seriousness of incorrectly denying customers the use of their PayPal accounts. Filing 46 at 13; filing 47-2 at 143. Sanctions were imposed: the plaintiff was told she was ineligible to post for open positions or for tuition reimbursement for 90 days, and that her performance rating and bonus might be affected. Filing 47-2 at 144. And she was warned that should anything similar happen again, she would be subject to further discipline, "up to and including termination . . . without further counseling." Filing 46 at 13; filing 47-2 at 144.

When Willey and the plaintiff met to discuss the mistakes described in the June 24, 2012 corrective counseling memo, the plaintiff defended some of her decisions. Filing 46 at 13; filing 47-3 at 53, 55. Willey decided to take a closer look at the plaintiff's performance. Filing 46 at 13; filing 47-3 at 53-55. While looking for other cases in which appeals had been denied, Willey discovered a number of cases that the plaintiff had "dumped" after they had been assigned to her. Filing 46 at 14; filing 47-2 at 145. In each case, although the plaintiff had not worked on the customer's account, she marked it as "already worked," meaning that the case was not delivered to anyone else right away. Filing 46 at 14; filing 47-2 at 145. Although other employees had done the same thing, Willey found that the plaintiff had done so at a rate significantly higher than her co-workers. Filing 46 at 14; filing 47-3 at 28-49. Willey also found that the plaintiff had repeatedly failed to follow procedures for logging into and out of her phone at the beginning and end of each shift. Filing 46 at 14-15; filing 47-2 at 146-47.

The plaintiff was fired on June 29, 2012.[3] Filing 46 at 15; filing 47-2 at 149. She was informed that the reasons for her termination were her

[3] There is a series of emails among Willey and MyHR consultants, regarding the termination, that the plaintiff relies upon as evidence of discrimination and retaliation. The

violations of phone login procedure, the poor work performance documented in the conversation memo and corrective counseling memo described above, and dumping cases without working on them. Filing 47-2 at 149. The plaintiff filed an Equal Employment Opportunity Commission charge, and after receiving her right-to-sue letter, sued in this Court. Filing 2; filing 2-1. The defendants' motion for summary judgment (filing 45) followed.

## II. STANDARD OF REVIEW

Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the Court of the basis for the motion, and must identify those portions of the record which the movant believes demonstrate the absence of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. *Id.*

On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts. *Id.* Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the evidence are jury functions, not those of a judge. *Id.* But the nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts. *Id.* In order to show that disputed facts are material, the party opposing summary judgment must cite to the relevant substantive law in identifying facts that might affect the outcome of the suit. *Quinn v. St. Louis County*, 653 F.3d 745, 751 (8th Cir. 2011). The mere existence of a scintilla of evidence in support of the nonmovant's position will be insufficient; there must be evidence on which the jury could conceivably find for the nonmovant. *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 791-92 (8th Cir. 2011). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Torgerson*, 643 F.3d at 1042.

## III. DISCUSSION

The plaintiff's complaint presents four claims: sexual harassment and a hostile work environment in violation of Title VII,[4] retaliation in violation of

---

Court finds them to be primarily relevant to her FMLA claim, and will discuss them in more detail below in that context.

[4] At least, the Court assumes that her claim is based on a hostile work environment. Her complaint does not use that term, and in her affidavit opposing summary judgment, the plaintiff asserts that "'[h]ostile work environment' is not my description but the description

Title VII, violation of the FMLA, and a state-law claim for tortious interference with a business relationship.

1. TITLE VII HOSTILE WORK ENVIRONMENT

The record is clear that Sebeck is the only person alleged to have harassed the plaintiff. So, this case involves allegations of co-worker harassment. In order to establish a *prima facie* case of gender discrimination on this theory, the plaintiff must be able to demonstrate that (1) she is a member of a protected class; (2) unwelcome harassment occurred; (3) the harassment was based on sex; (4) the harassment affected a term, condition, or privilege of employment; and (5) her employer, PayPal, knew or should have known of the harassment and failed to take proper remedial action. *Jackman v. Fifth Jud. Dist. Dep't of Corr. Servs.*, 728 F.3d 800, 805-06 (8th Cir. 2013); *Hervey v. Cty. of Koochiching*, 527 F.3d 711, 721 (8th Cir. 2008); *McCown v. St. John's Health Sys.*, 349 F.3d 540, 542 (8th Cir. 2003); *Scusa v. Nestle U.S.A. Co.*, 181 F.3d 958, 965 (8th Cir. 1999). It is not disputed that the plaintiff, as a woman, is a member of a protected class. And for purposes of summary judgment, the Court assumes that harassment occurred as the plaintiff described it. The plaintiff's case fails in every other respect.

(a) Harassment Not Based on Sex

To begin with, there is nothing in the record—nothing at all—to suggest that Sebeck's alleged harassment of the plaintiff was based on sex. "Title VII does not prohibit workplace harassment unless it is based on sex." *McCown*, 349 F.3d at 543. Whether harassing conduct constitutes discrimination based on sex is determined by whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed. *Scusa*, 181 F.3d at 965; *see McCown*, 349 F.3d at 543. "Stated differently, the harassment must be based on the complaining person's sex." *Scusa*, 181 F.3d at 965.

The plaintiff attempts to make up for her lack of evidence by labeling Sebeck's alleged conduct "gender stalking sexual harassment," and using that unwieldy phrase at every available opportunity.[5] *See*, filing 50, *passim*; filing

---

of Jody Willey's [sic] of what took place." Filing 52-11 at 5. But Title VII does not apply to co-workers—it prohibits *employers* from discriminating with respect to terms, conditions, or privileges of employment. 42 U.S.C. § 2000e-2(a)(1); *Powell v. Yellow Book USA, Inc.*, 445 F.3d 1074, 1079 (8th Cir. 2006). The Court analyzes the plaintiff's claim as a hostile work environment claim because that is the only theory upon which Sebeck's alleged conduct could support liability against PayPal.

[5] The use of the word "stalking" is questionable, as Sebeck's alleged conduct, even if every inference is given to the plaintiff, does not measure up to any reasonable definition of the

51, *passim*. But the plaintiff's rhetorical hyperbole is no substitute for proof, and the fact of the matter is that the plaintiff simply recites the events that took place "and claims they were taken because she is a woman." *See Hervey*, 527 F.3d at 722. The plaintiff has been "unable to provide any evidence, either directly or by inference, beyond her own speculation, that her alleged mistreatment was due to her protected status." *See Bradley v. Widnall*, 232 F.3d 626, 632 (8th Cir. 2000), *disapproved on other grounds, Torgerson*, 643 F.3d at 1043. In contrast, the Court's examination of the record reveals that the conflict between Sebeck and the plaintiff "stemmed from inter-office politics and personality conflicts rather than [sex] based animus." *See id.* The record is simply insufficient to create a jury question as to whether Sebeck's alleged conduct constituted discrimination because of sex. *See McCown*, 349 F.3d at 543-44; *see also*, *Hervey*, 527 F.3d at 721-22; *Bradley*, 232 F.3d at 632; *Scusa*, 181 F.3d at 965. The plaintiff can use her brief to label Sebeck as an "offending gender stalking sexually harassing male predator," filing 50 at 2, but has presented no evidence to substantiate the claim.

(b) Harassment not Severe and Pervasive

Nor is there sufficient evidence to suggest that the alleged harassment affected a term, condition, or privilege of employment. Title VII was not designed to create a federal remedy for all offensive language and conduct in the workplace. *Scusa*, 181 F.3d at 967. In order to find that harassment affected a term, condition, or privilege of employment, a plaintiff must be able to establish that, considering the totality of the circumstances, the conduct was extreme, such that intimidation and ridicule permeated the workplace. *Jackman*, 728 F.3d at 806. Factors to be considered when determining whether harassment is severe or pervasive include the frequency of the conduct, its severity, whether it is physically threatening or humiliating as opposed to a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. *Cottrill v. MFA, Inc.*, 443 F.3d 629, 636 (8th Cir. 2006); *Al-Zubaidy v. TEK Indus., Inc.*, 406 F.3d 1030, 1038 (8th Cir. 2005); *Bradley*, 232 F.3d at 631; *Scusa*, 181 F.3d at 967.

The issue under Title VII is whether the work environment was both objectively and subjectively offensive, that is, one that a reasonable person would find hostile or abusive. *Scusa*, 181 F.3d at 967. And in this case, while the plaintiff may have faced "a frustrating work situation," it was not "so severe or pervasive as to have affected a term, condition, or privilege of her employment." *See Bradley*, 232 F.3d at 631-32. Conduct must be extreme to

---

term. *Compare, e.g.,* 22 U.S.C. § 2507a(f)(4); 42 U.S.C. § 13925(a)(30); Neb. Rev. Stat. § 28-311.03.

amount to a change in the terms and conditions of employment. *Al-Zubaidy*, 406 F.3d at 1038. Seen objectively, the situation the plaintiff describes represents little more than "the ordinary tribulations of the workplace." *Scusa*, 181 F.3d at 966 (citations and quotations omitted); *see Al-Zubaidy*, 406 F.3d at 1039. Perhaps Sebeck was irritating, unpleasant, or rude, but that does not violate federal law. Even considered subjectively, the most the plaintiff can say seems to be that Sebeck was "causing a reasonable amount of making [her] uncomfortable in the work place" and that it caused her "stress at work."[6] Filing 52-11 at 5; filing 52-18 at 5. That falls well short of the "demanding" standards that are intended to ensure that "Title VII does not become a general civility code" for the American workplace. *See*, *Al-Zubaidy*, 406 F.3d at 1038-39; *Scusa*, 181 F.3d at 966-67; *see also Jackman*, 728 F.3d at 806.

(c) PayPal Took Proper Remedial Action

Finally, even if the record did permit an inference that the plaintiff had been harassed on the basis of sex, and that the harassment was severe and pervasive, the record would still lack evidence that PayPal failed to take proper remedial action. An employer is not liable if it takes prompt remedial action which is reasonably calculated to end the harassment once the employer knew or should have known about the harassment. *Scusa*, 181 F.3d at 967. And in this case, as described above, when the plaintiff first complained to Willey, Willey communicated with Sebeck's supervisor and her own manager, and acted by moving the plaintiff's desk. Sebeck was told about the complaint, and for a time his behavior allegedly changed. Filing 47-3 at 3. But when that apparently didn't work, and the plaintiff made a formal complaint, Sebeck agreed to keep his distance. When the plaintiff was told of that, and told to report any further issues, "[s]he seemed satisfied with this outcome." Filing 47-3 at 2. And after that, until the plaintiff's firing, there were no further issues.

In other words, "[t]he undisputed evidence showed that every time she complained to management, it responded to her satisfaction. Moreover, after management took action, the incidents were not repeated." *Scusa*, 181 F.3d at 968. Thus, management took appropriate action to end the alleged harassment. *See id.* There is no issue of material fact as to whether PayPal promptly and adequately responded to the plaintiff's complaints. *See id.*

---

[6] It is worth noting that to the extent that the plaintiff relies on conduct she found out about after the fact, and after her employment ended, it is irrelevant. A Title VII plaintiff may rely only on evidence relating to harassment of which she was aware during the time that she was allegedly subject to a hostile work environment. *Cottrill*, 443 F.3d at 636; *see Williams v. ConAgra Poultry Co.*, 378 F.3d 790, 794 (8th Cir. 2004).

In sum, the plaintiff's Title VII discrimination claim fails because she was not harassed on the basis of sex, the alleged harassment was not severe and pervasive, and PayPal took adequate remedial action when the situation was reported to management. But an employee may be sheltered from retaliation for complaining about workplace discrimination, even if a court eventually decides that the employee's complaints were without merit. *See Wallace v. Sparks Health Sys.*, 415 F.3d 853, 858 (8th Cir. 2005). So, the Court turns to the merits of the plaintiff's Title VII retaliation claim.

2. TITLE VII RETALIATION

Title VII makes it unlawful for an employer to discriminate against an employee because she has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under Title VII. *Brown v. City of Jacksonville*, 711 F.3d 883, 892 (8th Cir. 2013) (citing 42 U.S.C. § 2000e-3(a)). In other words, Title VII prohibits an employer from retaliating against an employee for opposing discrimination. *Wright v. St. Vincent Health Sys.*, 730 F.3d 732, 737 (8th Cir. 2013).

(a) No Direct Evidence of Retaliation

To make a submissible case, the plaintiff must present either direct evidence of retaliation, *or* create an inference of retaliation under the three-part burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-06 (1973). *Brown*, 711 F.3d at 892. Direct evidence requires proof of conduct or statements by persons involved in the decisionmaking process which indicate that a discriminatory attitude was more likely than not a motivating factor in the employer's decision. *Id.* at 892-93 and n.11 (citing *Kratzer v. Rockwell Collins, Inc.*, 398 F.3d 1040, 1046 (8th Cir. 2005)); *see Guimaraes v. SuperValu, Inc.*, 674 F.3d 962, 972 (8th Cir. 2012) (citing *Torgerson*, 643 F.3d at 1045). The plaintiff here has presented no direct evidence because nothing in the record shows a specific link sufficient to support a finding by a reasonable fact finder that her firing was in retaliation for the her complaints to management. *See Brown*, 711 F.3d at 892.

(b) *McDonnell Douglas* Burden-Shifting Framework

So, the plaintiff needs the three-part *McDonnell Douglas* analysis. Under that framework, she must first establish a *prima facie* case of retaliation. If she succeeds in doing so, the burden shifts to the defendant to offer a legitimate, nonretaliatory reason for terminating her. If it can do so, the burden shifts back to the plaintiff to prove that the proffered reason is merely a pretext for retaliation and, ultimately, that the defendant was actually motivated by retaliatory animus. *Brannum v. Mo. Dep't of Corrs.*,

518 F.3d 542, 547-48 (8th Cir. 2008); *Wallace*, 415 F.3d at 859-60; *see Brown*, 711 F.3d at 892-93; *see also Guimaraes*, 674 F.3d at 973, 977-78.

To establish a *prima facie* case, the plaintiff must show that (1) she engaged in statutorily protected conduct, (2) she suffered a materially adverse employment action, and (3) the protected conduct was a but-for cause of the adverse employment action. *See, Wright*, 730 F.3d at 737; *Bennett v. Riceland Foods, Inc.*, 721 F.3d 546, 551 (8th Cir. 2013); *Guimaraes*, 674 F.3d at 978. Because the plaintiff was fired, she has clearly suffered an adverse employment action. But the plaintiff's *prima facie* case fails because she did not engage in statutorily protected conduct, and she cannot prove that the conduct she did engage in was a but-for cause of her firing. And even if she had established a *prima facie* case, she cannot satisfy her burden of showing that PayPal's proffered reasons for her termination were pretextual.

*(i) No Evidence of Protected Activity*

The Court acknowledges, as noted above, that an underlying claim of discrimination need not have merit for an employee to be protected from retaliation for making it. *See Wallace*, 415 F.3d at 858; *see also Brannum*, 518 F.3d at 547. But the underlying claim must be one of discrimination. To provide a basis for a sexual harassment retaliation claim, the underlying complaint must have concerned conduct that a reasonable person would have believed was a violation of Title VII. *See Curd v. Hank's Discount Fine Furniture, Inc.*, 272 F.3d 1039, 1041-42 (8th Cir. 2001); *see also Brannum*, 518 F.3d at 547. And as set forth in detail above, while the plaintiff complained to her supervisors about Sebeck's alleged harassment, there is nothing in the record to suggest that she complained (before she was fired) that she was being harassed or otherwise discriminated against because of her gender.[7] She simply did not claim that gender discrimination (as opposed to generally uncivil behavior) was at issue. Nor, for the reasons explained above, could a reasonable person have concluded that Sebeck's alleged conduct was based on sex, or was sufficiently severe and pervasive, so as to violate Title VII. As a result, the plaintiff's complaints to management were not protected by Title VII because they did not involve a practice made unlawful by Title VII. *See*, *Guimaraes*, 674 F.3d at 978-79; *Smith v. Int'l Paper Co.*, 523 F.3d 845, 849-50 (8th Cir. 2008); *Brannum*, 518 F.3d at 548;

[7] The failure to expressly complain about gender discrimination also severs the chain of causation for the plaintiff's retaliation claim. An employee must show that the employer had actual or constructive knowledge of protected activity in order to establish unlawful retaliation. *Hervey*, 527 F.3d at 722. Because complaining about rudeness or disrespect does not necessarily implicate Title VII, it does not provide an employer with actual or constructive knowledge of protected activity by the complainant. *See id.* at 722-23.

*Tiedeman v. Neb. Dep't of Corrs.*, 144 Fed. Appx. 565, 566 (8th Cir. 2005); *Curd*, 272 F.3d at 1041-42.

*Smith*, 523 F.3d at 849-50, illustrates the point. In *Smith*, the employee complained to a manager that his supervisor was abusive—that he "'on a nightly basis . . . was cussing me, hollering, yelling at me.'" 523 F.3d at 846 (omission in original). The employee elaborated that his supervisor was "'hollering and cussing at me'" and falsely accusing him of damaging equipment. *Id.* The employee's supervisor found out about the employee's complaint and threatened to get back at the employee. *Id.* The employee was fired several months later, and he sued alleging he had been retaliated against for his complaint. *Id.* at 847-48. But the Eighth Circuit found that the employee had not engaged in conduct protected by Title VII. *Id.* at 849. Although the employee was African-American, his complaint to management about "yelling, cussing and hollering" at him, "'with no reference to race, color, . . . or national origin,'" did not constitute protected conduct. *Id.* at 849. And, the Eighth Circuit explained, no reasonable person could believe that the employee's complaints about workplace civility were protected under Title VII. *Id.* at 850.

Similarly, in this case, there is no evidence that the plaintiff's complaints to management referred to sex—and as a result, nothing to suggest that they were protected conduct. Nor could a reasonable person believe that Sebeck's conduct, as described, violated Title VII. So, because the plaintiff did not engage in protected conduct, her retaliation claim fails on this fundamental level.

*(ii) No Evidence of Causal Connection*

But even if protected conduct was somehow established, there is no evidence to show it caused her termination. To establish her *prima facie* case, the plaintiff must prove that the desire to retaliate was the but-for cause of her termination—that is, that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the defendant. *Wright*, 730 F.3d at 737. The protected conduct must be a determinative—not merely a motivating—factor in the adverse employment decision. *Id.* at 738.[8]

---

[8] Although the plaintiff does not articulate it, she seems to be advancing a cat's-paw theory of liability, in which an employer may be vicariously liable for an adverse employment action if one of its agents—other than the ultimate decisionmaker—is motivated by retaliatory animus and intentionally and proximately causes the action. *See, Bennett*, 721 F.3d at 551; *Guimaraes*, 674 F.3d at 972; *see also Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1194 (2011). The term is derived from one of Aesop's fables, in which "a monkey induces a cat by flattery to extract roasting chestnuts from the fire. After the cat has done so, burning

It generally requires "more than a temporal connection to establish a retaliation claim." *Id.* at 738-39 (quotation omitted); *see*, *Hervey*, 527 F.3d at 723; *Wallace*, 415 F.3d at 859. Without such a requirement, "an employer seeking to address the problem of underperforming employees could be paralyzed by the fear (or reality) of retaliation lawsuits, and unable to manage its workforce." *Hervey*, 527 F.3d at 726. And in this case, even the temporal connection is weak. While the plaintiff was fired only a few days after the investigation into her formal MyHR complaint was *closed*, it was several weeks after the complaint was made—and several months after the plaintiff began complaining to management about Sebeck's alleged conduct. For temporal proximity alone to show a causal link between a discharge and the filing of a complaint, it must be "very close." *Wallace*, 415 F.3d at 859 (quotation omitted). The Court is not persuaded that the 2 months between the formal complaint and the plaintiff's termination—and the approximately 6 months between the plaintiff's initial complaints and her termination—are sufficiently close. *See id.* (citing *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)). And the significance of any temporal proximity may be undercut by evidence—as is present here—that the employer had been concerned about a problem with the employee's performance before the employee engaged in protected activity. *See*, *Guimaraes*, 674 F.3d at 978; *Hervey*, 527 F.3d at 723. Simply put, there is nothing in the record to support an inference that the decision to fire the plaintiff was motivated by retaliatory animus.

*(iii) No Evidence that Reasons for Termination Were Pretextual*

And even if the plaintiff had managed to piece together a *prima facie* case of retaliation, she has failed to present evidence sufficient for a reasonable jury to find that PayPal's legitimate, non-discriminatory reason for her termination—her job performance—was a pretext for retaliation in violation of Title VII. *See Guimaraes*, 674 F.3d at 978. An employee may demonstrate pretext by two different methods. *See*, *Guimaraes*, 674 F.3d at 975; *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1052 (8th Cir. 2006). She may show pretext by persuading the Court that retaliatory animus more likely motivated her employer. *See id.* Or she may show that the employer's explanation is unworthy of credence because it has no basis in fact. *See id.* Either route amounts to showing that a prohibited reason, rather than the employer's stated reason, actually motivated the termination. *Guimaraes*, 674 F.3d at 975.

---

its paws in the process, the monkey makes off with the chestnuts and leaves the cat with nothing." *Staub*, 131 S. Ct. at 1190 n.1.

As should be evident from the discussion above, the first approach does not avail the plaintiff. Under that method, the employee rebuts the employer's ultimate factual claim regarding the absence of retaliatory intent by demonstrating that sufficient evidence of intentional retaliation exists for a jury to believe the plaintiff's allegations and find that the proffered explanation was not the true motivating explanation. *Stallings*, 447 F.3d at 1052. In other words, the employee may concede that the proffered reason for the termination *would have been* a sufficient basis for the adverse action while arguing that the employer's proffered reason was not the *true reason* for the action. *Id.* The plaintiff has not made such a concession, and as discussed above, she does not have evidence of intentional retaliation.

So, the question is whether the plaintiff can rebut PayPal's proffered explanation by establishing that it has no basis in fact. *Id.* To carry this burden, she must show that the employer's proffered reason was "unworthy of credence." *Wallace*, 415 F.3d at 860 (quotation omitted). She may do so by showing, for instance, that her performance was favorably reviewed before she was terminated, that similarly situated employees who did not engage in protected activity were treated more leniently, that the employer changed its explanation for why it fired her, or that the employer deviated from its policies. *Stallings*, 447 F.3d at 1052.

The plaintiff attacks PayPal's justification for firing her—her job performance—with a mélange of accusations. Their relevance is not always well explained. The plaintiff presents evidence from former co-workers and her current employer suggesting that she is a good worker. Filing 50 at 11; filing 52-3 at 4; filing 52-13 at 1-4.[9] She disputes some of the details about the incidents that PayPal used to justify firing her. Filing 50 at 4-5, 8; filing 52-10 at 2-5. And she accuses Willey and others of not permitting her to explain herself, conducting an ineffective investigation, and lying about her. Filing 50 at 5, 8; filing 52-11 at 2-5; filing 52-12 at 1.

---

[9] The defendants have objected to the plaintiff's exhibits on several grounds, including that they are not properly sworn and authenticated as required by NECivR 7.1(b)(2)(C) and Fed. R. Civ. P. 56(c)(4). The Court has elected to overlook these deficiencies—primarily because they do not change the result, but also because some of them are at least potentially curable. *See DG&G, Inc. v. FlexSol Packaging Corp. of Pompano Beach*, 576 F.3d 820, 825-26 (8th Cir. 2009); *see also Gannon Int'l Ltd. v. Blocker*, 684 F.3d 785, 793 (8th Cir. 2012) (citing Fed. R. Civ. P. 56(c)(2)). The Court has, instead, pieced together the pleadings and evidence as best it can. But in the end, it is counsel's responsibility, not the Court's, to make sure that things are filed correctly. The Court has interpreted the plaintiff's evidence and arguments "as favorably as the record allows." *See Brown*, 711 F.3d at 888. The plaintiff's counsel should be aware, however, that the Court may not be willing to undertake that effort again. *See id.* at 888 n.5.

To begin with, the statements proffered by former co-workers and the plaintiff's current employer are not compelling. The plaintiff's former co-workers say that she was a helpful colleague and a nice person. Filing 52-3 at 4; filing 52-13 at 3-4. The Court has no reason to doubt that. And the plaintiff's supervisor at her current employer, an assisted living facility, has good things to say about the plaintiff's ability and dedication to perform that job. Filing 52-13 at 1-2. Again, the Court has no reason to doubt that. But no part of that evidence contradicts, or even calls into question, the specific, objective reasons PayPal gave for firing the plaintiff.

The plaintiff's other contentions fare better, but not by much. It is important to remember that a federal court is not a super-personnel department with authority to review the wisdom or fairness of the business judgments made by employers. *See*, *Guimaraes*, 674 F.3d at 977; *Stallings*, 447 F.3d at 1052; *Wallace*, 415 F.3d at 860. The evidence must do more than raise doubts about the wisdom and fairness of the supervisor's opinions and actions—it must create a real issue as to the genuineness of the supervisor's perceptions and beliefs. *Hervey*, 527 F.3d at 725. And significantly, at her deposition, the plaintiff was unable to meaningfully dispute the information set forth in the "Conversation Memo," the "Corrective Counseling" memo, Willey's report on her investigation into the plaintiff's performance, or the termination notice issued to the plaintiff when she was fired. Filing 47-2 at 62, 67-73, 85-86, 90-91. That leaves very little reason to question the accuracy of the information on which the plaintiff's firing was based.

In her affidavit opposing summary judgment (as opposed to her deposition), the plaintiff does claim that the system used to mark cases as "already worked" and transfer them was flawed and prone to errors. Filing 52-10 at 2-3. She contends that the co-workers with whom she was compared, for purposes of evaluating her "case dumping" rate, were not "apple to apples" for purposes of comparison. Filing 52-10 at 2. She also claims that other agents commonly made the same mistakes that she did with respect to logging in and out of her phone. Filing 52-10 at 4-5. She presents some rough calculations that, she claims, shows she was a good employee. Filing 52-11 at 1. And, she claims, she was not given an opportunity to defend herself. Filing 52-12 at 1.

But the appropriate scope of investigation is a business judgment, and shortcomings in an investigation do not by themselves support an inference of retaliation. *See Guimaraes*, 674 F.3d at 979. And the failure to discipline other employees does not prove that the plaintiff was treated differently, without evidence that those employees were similarly situated except for not engaging in protected activity. *See Hervey*, 527 F.3d at 735. The plaintiff's mathematical attempt to prove that she was a good worker means little

without any frame of reference for what error rate would be acceptable, and Willey's investigation suggested that the plaintiff's performance was meaningfully different from her colleagues.[10] There is no evidence that PayPal's policies with respect to "case dumping" or phone logins were applied inconsistently to other employees who were similarly situated in all relevant respects. *See Wallace*, 415 F.3d at 860. Even taken together, there is simply nothing here to suggest that the decision to terminate the plaintiff, however unfair the plaintiff might believe it to have been, was motivated by a desire to retaliate.

The plaintiff also suggests that Willey lied to the MyHR investigator with respect to the formal harassment complaint. Filing 50 at 8; filing 52-11 at 2. There is no clear explanation for why that, even if true, would prove that the plaintiff was retaliated against for making the complaint. But more fundamentally, the plaintiff's suggestion is contrary to the record. The plaintiff claims that in an email to the investigator, Willey "falsely claimed that [the plaintiff] was talking about the case to other agents and spreading gossip like wildfire." Filing 52-11 at 2; *see also* filing 50 at 8. The plaintiff claims that she "was not discussing anything" about Sebeck or the harassment complaint with other agents. Filing 52-11 at 4. But by the plaintiff's own admission, she had learned (and reported to Willey) that Sebeck was supposedly discussing the case with other agents—by talking to another agent about the case.[11] *See* filing 52-11 at 2-3.

In sum, there is simply not sufficient evidence for a reasonable jury to find that the plaintiff was targeted for termination because she complained about Sebeck. Title VII is a shield to protect employees from retaliation for exercising their right to challenge unlawful discrimination, "not a cudgel to be wielded by underperforming . . . employees to prevent justified, non-discriminatory employment termination." *Brown*, 711 F.3d at 894. It does not provide an employee with immunity for past and present inadequacies or unsatisfactory performance. *Jackson v. St. Joseph State Hosp.*, 840 F.2d

---

[10] The plaintiff essentially complains that the co-workers with whom she was compared were not similarly situated to her. *See* filing 52-10 at 3. But PayPal has still presented more evidence of how the plaintiff compared to other employees than the plaintiff has, because the plaintiff hasn't presented any.

[11] The plaintiff also relies on several emails among Willey and MyHR consultants about the plaintiff's termination. It is unclear whether that evidence is meant to support the plaintiff's Title VII claims or her FMLA claim (or even her state-law tort claim). But because the emails directly implicate the FMLA, the Court has chosen to address them below, in that context. As will be apparent, the Court's discussion below is equally dispositive of any support (however tenuous) that the emails might provide the plaintiff's Title VII claims.

1387, 1390 (8th Cir. 1988). In this case, even if the plaintiff had engaged in activity protected by Title VII (which she did not), and even if she made a *prima facie* case of retaliation (which she also did not), she has failed to present evidence sufficient to show that PayPal's stated reasons for firing her were pretextual. Accordingly, the plaintiff's Title VII claims must be dismissed.

3. FMLA CLAIMS

The FMLA, as relevant, provides an eligible employee with 12 workweeks of unpaid leave "[i]n order to care for the spouse, or a son, daughter, or parent, of the employee," who has a serious health condition. 29 U.S.C. § 2612(a)(1)(C). The FMLA prohibits employers from interfering with an employee's exercise of FMLA rights, or discharging or otherwise discriminating against an employee for opposing a practice the FMLA makes unlawful. 29 U.S.C. § 2615(a). The Eighth Circuit has held that the statute prohibits retaliation against an employee who exercises her FMLA rights. *Lovland v. Emp'rs Mut. Cas. Co.*, 674 F.3d 806, 810-11 (8th Cir. 2012).

So, an employee can make two types of FMLA claim. *See*, *Bone v. G4S Youth Servs., LLC*, 686 F.3d 948, 958 (8th Cir. 2012); *Chappell v. Bilco Co.*, 675 F.3d 1110, 1115 (8th Cir. 2012); *Wisbey v. City of Lincoln*, 612 F.3d 667, 675 (8th Cir. 2010), *disapproved on other grounds, Torgerson*, 643 F.3d at 1043; *Stallings*, 447 F.3d at 1050. In an interference claim, the employee alleges that an employer denied or interfered with her substantive rights under the FMLA; and in a retaliation claim, the employee alleges that the employer discriminated against her for exercising her FMLA rights. *See id.* In an interference claim pursuant to 29 U.S.C. § 2615(a)(1), the employer's intent in denying the benefit is immaterial; by contrast, a retaliation claim under 29 U.S.C. § 2615(a)(2) requires proof of an impermissible discriminatory animus, typically with evidence analyzed under the *McDonnell Douglas* burden-shifting framework. *Lovland*, 674 F.3d at 811; *see Wisbey*, 612 F.3d at 675.

It is not clear what type of claim the plaintiff is trying to assert here. Part of that is the plaintiff's fault. Her complaint merely asserts that PayPal "violated the Plaintiff's rights" under the FMLA, although her claim for continuing damages implies a retaliation claim, insofar as such damages would seem to flow from her termination, not any lost opportunity to take leave. *See* filing 2-1 at 1. And the plaintiff's brief opposing summary judgment cites neither any specific provision of the FMLA nor any caselaw applying it, although the words "discrimination" and "retaliation" are used, also suggesting a retaliation claim. Filing 51 at 10-11. But in the plaintiff's defense, the line between the two categories is not hard and fast, and

confusion often arises. *Stallings*, 447 F.3d at 1051. And in any event, the Court finds summary judgment proper as to both types of claim. *See Wisbey*, 612 F.3d at 675.

(a) FMLA Interference Claim

In an interference claim, an employee must only show that he or she was entitled to an FMLA benefit that was denied. *Wisbey*, 612 F.3d at 675; *Stallings*, 447 F.3d at 1050. An employee can prove interference with an FMLA right regardless of the employer's intent. *Chappell*, 675 F.3d at 1115; *Stallings*, 447 F.3d at 1050. But the FMLA is not a strict liability statute, and an employer is not liable for interference if an adverse employment decision was unrelated to the employee's use of FMLA leave. *See*, *Bone*, 686 F.3d at 958-59; *Chappell*, 675 F.3d at 1115; *Lovland*, 674 F.3d at 812; *Stallings*, 447 F.3d at 1050-51; *Throneberry v. McGehee Desha Cty. Hosp.*, 403 F.3d 972, 977, 980 (8th Cir. 2005). The plaintiff cannot prove an interference claim in this case for two very fundamental reasons: she was not entitled to an FMLA benefit, and she was never denied any benefit that she requested.

First, the plaintiff was not entitled to an FMLA benefit because the reason she sought and took leave—the care of her ailing grandmother—is not protected by the FMLA. As noted above, the FMLA authorizes leave to care for parents, but not grandparents. *See*, 29 U.S.C. § 2612(a)(1)(C); *Krohn v. Forsting*, 11 F. Supp. 2d 1082, 1091-92 (E.D. Mo. 1998); *Bauer v. Dayton-Walther Corp.*, 910 F. Supp. 306, 308 n.2 (E.D. Ky. 1996). Parents may include biological parents or an individual who has stood *in loco parentis* to an employee when the employee was a son or daughter. 29 U.S.C. § 2611(7); *Krohn*, 11 F. Supp. 2d at 1091. There is nothing here to suggest that the plaintiff's grandmother, however beloved, stood *in loco parentis* to the plaintiff.[12] *See Krohn*, 11 F. Supp. 2d at 1092.

Second, the record is clear that the plaintiff was never denied any benefits that she requested. In the absence of an actual denial of FMLA leave, the plaintiff's FMLA rights were not interfered with. *See Wisbey*, 612 F.3d at 675.

That being said, this is the point at which the line between interference and retaliation claims, if it really exists at all, becomes very hard to see. The

---

[12] The Court recognizes that this issue was not raised by the defendants, although it is not clear why. The Court has, therefore, considered whether the plaintiff had appropriate notice of this potential basis for summary judgment. *See* Fed. R. Civ. P. 56(f). The Court nonetheless finds it appropriate to discuss the issue, for two reasons. First, it is not unfair to expect the plaintiff to be aware of the most fundamental element of her *prima facie* case. And second, the Court has other reasons to dismiss the plaintiff's FMLA claim, so this point only reinforces the Court's conclusion.

Eighth Circuit has said, and reaffirmed, that a retaliation claim, not an interference claim, exists when the employer grants every request that the employee made to take FMLA leave. *Wisbey*, 612 F.3d at 675; *Stallings*, 447 F.3d at 1051; *see Lovland*, 674 F.3d at 810-12. But an interference claim covers not only refusing to authorize FMLA leave, but also manipulation by an employer to avoid responsibilities under the FMLA. *Dollar v. Smithway Motor Xpress, Inc.*, 710 F.3d 798, 806 (8th Cir. 2013). The Eighth Circuit has therefore concluded that terminating an employee in response to a qualifying employee's assertion of rights may also qualify as interference. *Id.*; *see also Pereda v. Brookdale Senior Living Cmtys, Inc.*, 666 F.3d 1269, 1274 (11th Cir. 2012) (holding that employees are protected from interference prior to the occurrence of a triggering event). So, if the plaintiff had evidence that she was fired because she was about to begin FMLA leave—that is, that her termination was causally linked to impending leave—it would arguably support either an interference claim, or a retaliation claim, or both, depending on which cases you read.

But the plaintiff has no such evidence. One thing that is clear is that FMLA leave does not insulate an employee from termination for reasons unrelated to the FMLA. *See*, *e.g.*, *Bone*, 686 F.3d at 959; *Throneberry*, 403 F.3d at 979-80. In other words, as long as an employer can show a lawful reason for termination, i.e., a reason unrelated to an employee's exercise of FMLA rights, any resulting interference with the employee's FMLA leave rights will be justified. *See Throneberry*, 403 F.3d at 979. The plaintiff claims that the evidence is sufficient to support a finding that her termination was causally related to the FMLA. The Court will discuss that evidence in more detail below, in the context of the plaintiff's retaliation claim. For the moment, it suffices to say that for all the reasons discussed below (and above, in the context of the plaintiff's Title VII retaliation claim), the Court finds that the evidence would not support a finding that the plaintiff was fired for any reason other than the reasons given by PayPal.

(b) FMLA Retaliation Claim

To establish a *prima facie* claim of retaliation, the plaintiff must show that (1) she engaged in activity protected by the FMLA, (2) she suffered an adverse employment action, and (3) there was a causal connection between her exercise of FMLA rights and the adverse employment action. *Chappell*, 675 F.3d at 1116-17; *Wisbey*, 612 F.3d at 676. If she does so, the burden shifts to PayPal to promulgate a legitimate, non-discriminatory justification for its conduct, and then back to the plaintiff to rebut that justification as a pretext

for discrimination.[13] *See*, *Chappell*, 675 F.3d at 1117; *Stallings*, 447 F.3d at 1051-52.

As before, there is no dispute that the plaintiff suffered an adverse employment action. And the Court will assume that there is at least a genuine issue of material fact as to whether she engaged in protected activity.[14] But the Court finds no causal connection between that activity and her termination.

The plaintiff's argument rests almost entirely on an email Willey sent to MyHR consultants regarding the plaintiff's termination. After Willey investigated the plaintiff's job performance and recommended to MyHR that the plaintiff be fired, she exchanged emails with MyHR consultants regarding administrative aspects of the termination. Filing 52-10 at 1. That process began on Monday, June 25, 2014, and by Wednesday, one of the consultants expressed that they "should try to complete the termination when [the plaintiff] comes in for her shift on Friday." Filing 52-9 at 5; filing 52-10 at 1. Willey replied, stating that,

---

[13] It is not clear whether the plaintiff might be arguing that she has direct evidence of discrimination, such that the *McDonnell Douglas* burden-shifting analysis is not necessary. *See Chappell*, 675 F.3d at 1110. But the Court finds no such direct evidence, for the same reasons it finds that the evidence does not establish a causal connection under the *McDonnell Douglas* framework.

[14] This is far from certain, because as the Court discussed earlier, there is nothing in the record to suggest that the plaintiff was actually entitled to FMLA leave to care for her grandmother. But the Court also assumes that an FMLA retaliation claim is akin to a claim under Title VII or another similar anti-retaliation provision, in that a request for leave may be protected activity under the FMLA if the employee had a reasonable belief that she was entitled to FMLA leave. *See*, *Surprise v. Innovation Grp., Inc./First Notice Sys., Inc.*, 925 F. Supp. 2d 134, 146 (D. Mass. 2013); *Williams v. Crown Liquors of Broward, Inc.*, 878 F. Supp. 2d 1307, 1311-12 (S.D. Fla. 2012).

Although it would seem apparent to a reasonable person that a grandparent's care does not establish a right to FMLA leave, the Court also observes that PayPal's benefits administrator used "FMLA" forms to manage the plaintiff's leave. The FMLA is a floor, not a ceiling—an employer can provide more generous leave than the FMLA requires, and it would make sense for the employer to use the same paperwork regardless of whether the strict legal requirements of the FMLA were implicated. An employer is not estopped from denying FMLA eligibility later. *See Walker v. Trinity Marine Prods., Inc.*, 721 F.3d 542, 545 (8th Cir. 2013); *see also Dawkins v. Fulton Cty. Gov't*, 733 F.3d 1084, 1089-91 (11th Cir. 2013). But there might at least be a tenable argument that if an employer repeatedly allows something it calls "FMLA leave," such conduct might form the basis for an employee's reasonable, good-faith belief that asking for more leave under the same circumstances would be protected by the FMLA.

> I agree we should complete the term[ination] on Friday. [One of the MyHR consultants] had mentioned we should tell [the plaintiff] about the additional research completed and our findings, type up her response and email it to you (in case you feel there are any red flags), and then terminate. My concern is that the last time I had a rough conversation (regarding the behavior that led to [the plaintiff's] most recent [corrective counseling]), she claimed FMLA and left for the day. I'm worried she may do the same after we have this conversation. She also said last weekend after getting her [corrective counseling] that she may file a new FMLA claim to take an extended period of work off due to her grandmother being sick with cancer. I can see where if she feels she is going to be fired, she will leave and contact [PayPal's benefits administrator] to file this claim, knowing it will extend her employment with us.[15]

Filing 52-9 at 5. After some other administrative tasks were completed, the plaintiff was, indeed, fired on Friday. Filing 47-2 at 149.

The plaintiff tries to make a mountain out of that molehill, asserting that Willey's "hateful emails," in which she "feverishly and obsessively plotted the [plaintiff's] discharge," are "specific evidence of discrimination and retaliation." Filing 50 at 3; filing 51 at 10. That goes too far. To begin with, the MyHR consultant had already decided that the plaintiff should be terminated, and that she should be terminated on Friday. That made sense: the plaintiff's work schedule was three 12-hour shifts and one 4-hour shift, on Friday, Saturday, and Sunday. Filing 2 at 3. So, at the time of this email exchange, Friday was the plaintiff's next shift, and her first of the week.

And more to the point, the plain meaning of Willey's email is that she was concerned about *misuse* of the FMLA to avoid a legitimate termination. The specific point being discussed was not whether to fire the plaintiff, or even *when* to fire the plaintiff—it was whether to hold a separate conversation with the plaintiff, about the results of Willey's investigation, before actually firing her. Read in context, nothing about the email suggests that the plaintiff was being fired because of activity protected by the FMLA—rather, it suggests the opposite. And the plaintiff admits that she did leave work after her conversation with Willey about the issues described in the June 24, 2012 "corrective counseling" memo, taking "FMLA leave." Filing 47-

[15] Willey's belief was legally misplaced—as noted above, FMLA leave does not prevent an employee from being fired for misconduct, or any other lawful reason. *See Throneberry*, 403 F.3d at 977-79.

2 at 119; filing 47-2 at 6; filing 52-11 at 1. The plaintiff contends that she had not left work because of her conversation with Willey, filing 52-11 at 5, but there was at least a factual basis for the concern expressed in Willey's email. And the plaintiff's "unchallenged use" of "FMLA leave" on numerous other occasions supports PayPal's explanation that the plaintiff was terminated only when her job performance was discovered to be deficient. *See Chappell*, 675 F.3d at 1118.

In sum, Willey's email, while it does mention the possibility of FMLA leave, does not support an inference that the plaintiff was terminated in order to interfere with her legitimate rights under the FMLA, or to retaliate against her for exercising them. As a result, it does not help the plaintiff meet her *prima facie* case, because it does not show a causal connection between her exercise of FMLA rights and the adverse employment action.

And even if the plaintiff had established a *prima facie* case for retaliation, the evidence does not demonstrate that PayPal's proffered reasons for firing her were pretextual. As discussed above in the context of the plaintiff's Title VII retaliation claim, she has presented no evidence demonstrating that PayPal's proffered reason for firing her had no basis in fact. *See Stallings*, 447 F.3d at 1052. Nor is there any evidence of similarly situated employees who had not taken FMLA leave, or expressed an intent to take FMLA leave, being treated differently. *See id.* The plaintiff must prove more than the *prima facie* case to prove pretext, because unlike evidence establishing the prima facie case, evidence of pretext and discrimination is viewed in light of the employer's justification. *Chappell*, 675 F.3d at 1117. She has not done so.

The Court's task is to decide whether the record reveals issues of material fact that would preclude the entry of summary judgment in favor of PayPal. *See Stallings*, 447 F.3d at 1052. Even taken in the light most favorable to the plaintiff, *see id.*, the evidence here would not support a finding that the plaintiff had been fired to interfere with her FMLA rights, or to retaliate against her for doing so. Her FMLA claim will be dismissed.

4. TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP

Finally, the plaintiff alleges a state-law claim for tortious interference with a business relationship against Sebeck, Willey, and Johnson.[16] The

---

[16] It does not appear from the plaintiff's complaint that her Title VII or FMLA claims were brought against anyone but PayPal. *See*, filing 2 at 11-13; filing 2-1 at 1. That makes sense for Title VII, which does not provide for an action against an individual supervisor or co-worker. *See*, *Powell*, 445 F.3d at 1079; *Bales v. Wal-Mart Stores, Inc.*, 143 F.3d 1103, 1111 (8th Cir. 1998). The definition of "employer" under the FMLA, however, has been held to include individual supervisors acting in the employer's interest. *See Darby v. Bratch*, 287

elements of such a claim are: (1) the existence of a valid business relationship or expectancy, (2) knowledge by the interferer of the relationship or expectancy, (3) an unjustified intentional act of interference on the part of the interferer, (4) proof that the interference caused the harm sustained, and (5) damage to the party whose relationship or expectancy was disrupted. *Huff v. Swartz*, 606 N.W.2d 461, 466 (Neb. 2000). An at-will employment relationship can be the subject of a tort action for intentional interference with a business relationship or expectancy, and such an action may be maintained against a co-employee who acts as a third party to the relationship by taking actions for his or her own personal benefit, or for the benefit of an entity other than the employer. *Id.* at 470.

But here, there is no evidence that Willey or Johnson acted for their own personal benefit or the benefit of any entity other than PayPal. Even if their actions had been taken in contravention of Title VII or the FMLA, that would not establish that they had a personal interest in the plaintiff's termination. The plaintiff suggests that Willey acted from a personal animus against the plaintiff, but has presented no evidence to substantiate that belief, other than her own speculation. Even if Willey had behaved badly (and there is scant evidence of that), "there is no evidence that [she] did so in any capacity other than as [a PayPal] manager addressing a job performance issue involving a subordinate employee." *See id.* at 469. The defendants have presented evidence establishing how and why the plaintiff was terminated. The plaintiff has presented no evidence supporting a reasonable inference that the actions about which the plaintiff complains were not taken on behalf of PayPal. *See id.* at 470.

Nor is there any evidence to suggest that firing the plaintiff was unjustified. The factors to be considered in determining whether interference with a business relationship is unjustified may include the nature of the actor's conduct, the actor's motive, the interests of the other with which the actor's conduct interferes, the interests sought to be advanced by the actor, the social interests in protecting the freedom of action of the actor and the

---

F.3d 673, 680-81 (8th Cir. 2002); *see also*, *Saavedra v. Lowe's Home Ctrs., Inc.*, 748 F. Supp. 2d 1273, 1291-96 (D.N.M. 2010) (collecting cases); *Longstreth v. Copple*, 101 F. Supp. 2d 776, 778-81 (N.D. Iowa 2000) (collecting cases). To be clear: to the extent that the plaintiff's Title VII claims might have been asserted against any individual defendant, they are dismissed, for all the reasons stated above, and because none of the individual defendants are subject to liability under Title VII. And to the extent that the plaintiff's FMLA claim might have been brought against any individual defendant, it is dismissed, for all the reasons stated above, because Willey and Johnson did not have sufficient authority to hire or fire the plaintiff, and because Sebeck neither had sufficient authority nor was involved in any of the relevant decisions. *See Saavedra*, 748 F. Supp. 2d at 1292-96.

contractual interests of the other, the proximity or remoteness of the actor's conduct to the interference, and the relations between the parties. *Id.* at 468 (citing the Restatement (Second) of Torts § 767 (1979)). The issue in each case is whether the interference is unjustified or not under the circumstances—whether, upon a consideration of the relative significance of the factors involved, the conduct should be permitted without liability, despite its effect of harm to another. *Id.* (citing the Restatement, § 767 cmt. b).

The Court's discussion of whether PayPal's reasons for firing the plaintiff were pretextual, set forth at length above, is substantially applicable here as well. There is nothing to suggest that the plaintiff's termination was not sincerely motivated by concerns about her job performance. As a result, when the relevant factors are weighed, there is also nothing to suggest that the plaintiff's termination was unjustified.

There is even less to support the plaintiff's case against Sebeck. Even if he harassed the plaintiff, as he has been accused of, there is no evidence that his conduct resulted in the plaintiff's termination. The Court's dismissal of the plaintiff's Title VII retaliation claim is also dispositive on this point.

In sum, even if some of the individual defendants were partly responsible for severing the plaintiff's employment relationship with PayPal, their acts were not tortious. Willey and Johnson were acting in the scope of their employment, and Sebeck was not involved in the actual termination. So, the plaintiff's claim for tortious interference with a business relationship will be dismissed.

IT IS ORDERED:

1. The defendants' motion for summary judgment (filing 45) is granted.

2. The plaintiff's complaint is dismissed.

3. A separate judgment will be entered.

Dated this 29th day of April, 2014.

BY THE COURT:

John M. Gerrard
United States District Judge